**No. 25-14109**

# In the United States Court of Appeals for the Eleventh Circuit

BUILDING RESILIENT INFRASTRUCTURE & DEVELOPING GREATER EQUITY, INC.,
*Plaintiff-Appellant,*

v.

CONSUMER FINANCIAL PROTECTION BUREAU *and* RUSSELL VOUGHT, *in his official capacity as Acting Director, Consumer Financial Protection Bureau*,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Middle District of Florida
No. 8:25-cv-1367 (Barber, J.)

## PLAINTIFF-APPELLANT'S OPENING BRIEF

JOHN S. GIBBS III
ALEXANDER J. HILL
TROUTMAN PEPPER LOCKE LLP
600 Peachtree St. NE, Suite 3000
Atlanta, GA 30308
(404) 885-3000
evan.gibbs@troutman.com
alexander.hill@troutman.com

MISHA TSEYTLIN
*Counsel of Record*
KEVIN M. LEROY
CARSON A. COX
TROUTMAN PEPPER LOCKE LLP
111 South Wacker Dr., Suite 4100
Chicago, IL 60606
(608) 999-1240
misha.tseytlin@troutman.com
kevin.leroy@troutman.com
carson.cox@troutman.com

*Counsel for Plaintiff-Appellant Building Resilient Infrastructure & Developing Greater Equity, Inc.*

25-14109 - Building Resilient Infrastructure & Developing Greater Equity, Inc. v. Consumer Financial Protection Bureau

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

The undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case.

1. Barber, Thomas P., United States District Judge, Middle District of Florida
2. Building Resilient Infrastructure & Developing Greater Equity, Inc., Plaintiff-Appellant
3. Consumer Financial Protection Bureau, Defendant-Appellee
4. Cox, Carson A., counsel for Plaintiff-Appellant
5. Deal, Christopher, counsel for Defendants-Appellees
6. Dorfman, Victoria, counsel for Defendants-Appellees
7. FortiFi Financial, Inc.
8. Frisone, Joseph, counsel for Defendants-Appellees
9. Gibbs III, John S., counsel for Plaintiff-Appellant
10. Hill, Alexander J., counsel for Plaintiff-Appellant
11. LeRoy, Kevin M., counsel for Plaintiff-Appellant
12. Matthews, Andrea, counsel for Defendants-Appellees
13. PACE Funding Group, LLC d/b/a Home Run Financing
14. Paoletta, Mark, counsel for Defendants-Appellees

15. Renew Financial Group, LLC
16. Shapiro, Daniel, counsel for Defendants-Appellees
17. Tseytlin, Misha, counsel for Plaintiff-Appellant
18. Vought, Russell, in his official capacity as Acting Director, Consumer Financial Protection Bureau, Defendant-Appellee
19. Ygrene Energy Fund Inc.

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant certifies that no publicly traded company or corporation has an interest in the outcome of the case or appeal, and that BRIDGE has no parent corporation, and no publicly held corporation owns ten percent or more of its stock.

December 23, 2025

*s/ Misha Tseytlin*
Misha Tseytlin

*Counsel for Plaintiff-Appellant Building Resilient Infrastructure & Developing Greater Equity, Inc.*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant requests oral argument, unless oral argument would prevent this Court from issuing a decision before the March 1, 2026, effective date of the rule at issue here. This case raises significant statutory, constitutional, and Administrative Procedure Act issues. Accordingly, Plaintiff-Appellant respectfully submits that oral argument will aid the Court in deciding these important issues, assuming that this would not interfere with this Court's ability to issue a decision by the challenged rule's effective date.

## TABLE OF CONTENTS


STATEMENT REGARDING ORAL ARGUMENT .................................. i

INTRODUCTION .................................. 1

JURISDICTIONAL STATEMENT .................................. 5

STATEMENT OF THE ISSUES .................................. 6

STATEMENT OF THE CASE .................................. 6

A. PACE .................................. 6

B. The Final Rule .................................. 15

C. Procedural Background .................................. 17

STANDARD OF REVIEW .................................. 23

SUMMARY OF THE ARGUMENT .................................. 24

ARGUMENT .................................. 28

I. BRIDGE Is Likely To Succeed On The Merits .................................. 28

A. The Rule Exceeds CFPB's Statutory Authority .................................. 29

B. CFPB Acted Arbitrarily And Capriciously By Relying On The Flawed PACE Report .................................. 42

C. The Final Rule Violates The Tenth Amendment By Infringing Upon State Taxation Authority And By Commandeering State Officials .................................. 49

II. BRIDGE's Members Will Suffer Irreparable Harm Without A Preliminary Injunction .................................. 60

III. The Balance Of The Equities And The Public Interest Strongly Favor Granting A Preliminary Injunction, Including Because Enforcement Of The Rule Is Unlawful .................................. 64

CONCLUSION .................................. 66

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

**TABLE OF CITATIONS***

**Cases**

*Abbott Lab'y v. Sandoz, Inc.*,
544 F.3d 1341 (Fed. Cir. 2008) .......... 60

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) .......... 60, 63

*Ala. Env't Council v. Adm'r, EPA*,
711 F.3d 1277 (11th Cir. 2013) .......... 34, 49

*Animal Legal Def. Fund v. USDA*,
789 F.3d 1206 (11th Cir. 2015) .......... 34

*Barber v. Governor of Ala.*,
73 F.4th 1306 (11th Cir. 2023) .......... 23

*Bayou Lawn & Landscape Servs. v. Sec'y of Labor*,
713 F.3d 1080 (11th Cir. 2013) .......... 31

*Beach v. Ocwen Fed. Bank*,
523 U.S. 410, 412 (1998) .......... 10

*Bidi Vapor LLC v. FDA*,
134 F.4th 1282 (11th Cir. 2025) .......... 43, 48, 49

**Bilski v. Kappos*,
561 U.S. 593 (2010) .......... 30, 38, 39

*Burke v. Renew Fin. Grp., Inc.*,
No.2:21-CV-02938, 2021 WL 5177776 (C.D. Cal. Aug. 13, 2021) .......... 13

*Cnty. of Sonoma v. Fed. Hous. Fin. Agency*,
710 F.3d 987 (9th Cir. 2013) .......... 12

* Citations upon which Plaintiff-Appellant primarily relies are marked with asterisks.

*Columbia Broad. Sys. v. United States*,
316 U.S. 407 (1942) .......... 60

*Concepcion v. Ygrene, Inc.*,
No.19-CV-1465, 2020 WL 1493617 (S.D. Cal. Mar. 27, 2020) .......... 13

*Curry v. McCanless*,
307 U.S. 357 (1939) .......... 53

*Dep't of Revenue of Or. v. ACF Indus., Inc.*,
510 U.S. 332 (1994) .......... 50, 52

*Dep't of the Army v. Blue Fox, Inc.*,
525 U.S. 255 (1999) .......... 63

*Faber, Coe & Gregg of Fla., Inc. v. Wright*,
178 So.2d 51 (Fla. Dist. Ct. App. 1965) .......... 41

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......... 42, 48

*FEC v. Cruz*,
596 U.S. 289 (2022) .......... 31

*Fla. Agency for Health Care Admin. v. Adm'r for Centers for Medicare & Medicaid Servs.*,
No. 24-10875, 2025 WL 3496406 (11th Cir. Dec. 5, 2025) .......... 24

*Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*,
570 F.3d 1210 (11th Cir. 2009) .......... 31, 32, 33

*Gibbons v. Ogden*,
22 U.S. (9 Wheat) 1 (1824) .......... 52, 57

*Hewitt v. Comm'r of IRS*,
21 F.4th 1336 (11th Cir. 2021) .......... 42

*Household Credit Servs., Inc. v. Pfennig*,
541 U.S. 232 (2004) .......... 10

**In re Hero Loan Litig.* ("Hero"), No.ED CV 1602478-AB, 2017 WL 3038250 (C.D. Cal. 2017) .......... 12, 13, 33, 39, 40

*Int'l Harvester Co. v. Wis. Dep't of Tax'n*,
322 U.S. 435 (1944) .......... 53

*Jysk Bed'N Linen v. Dutta-Roy*,
810 F.3d 767 (11th Cir. 2015) .......... 60

*Koons Buick Pontiac GMC, Inc. v. Nigh*,
543 U.S. 50 (2004) .......... 8, 10

**Lane Cnty. v. Oregon*,
74 U.S. (7 Wall.) 71 (1868) .......... 50, 51, 52, 53, 55, 56, 57

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) .......... 24, 28, 30, 33

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819). .......... 52, 54, 56

*Monsalvo v. Bondi*,
604 U.S. 712 (2025) .......... 35, 36, 37

*Morgan v. Ygrene Energy Fund, Inc.*,
No.S277628, 2025 WL 3483108 (Cal. Dec. 4, 2025) .......... 40

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 42, 43, 45, 46

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) .......... 49, 54, 58, 59

*New York v. United States*,
505 U.S. 144 (1992). .......... 50, 54

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 24, 64

*Odebrecht Constr. v. Sec'y, Fla. Dep't of Transp.*,
715 F.3d 1268 (11th Cir. 2013) .......... 60

*Ohio v. EPA*,
603 U.S. 279 (2024) .......... 60

*Printz v. United States*,
521 U.S. 898 (1997) .............................................. 50, 52, 54, 57, 58, 59

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) .............................................................. 29, 35

*Rich v. Fla. Dep't of Corr.*,
716 F.3d 525 (11th Cir. 2013) .................................................... 3

*Salmeron-Salmeron v. Spivey*,
926 F.3d 1283 (11th Cir. 2019) ........................................... 43, 49

*Scott v. Roberts*,
612 F.3d 1279 (11th Cir. 2010) .................................... 24, 64, 65

*Tug Allie-B, Inc. v. United States*,
273 F.3d 936 (11th Cir. 2001) ............................................... 29, 35

*Union Pac. R.R. Co. v. Peniston*,
85 U.S. (18 Wall.) 5 (1873) ........................................... 51, 53, 57

*United States v. Crape*,
603 F.3d 1237 (11th Cir. 2010) ............................................ 29, 30

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) .............................................................. 64, 65

*West Virginia v. ex rel. Morrisey v. U.S. Dep't of the Treasury*,
59 F.4th 1124 (11th Cir. 2023) ............................................ 65, 66

*Wood v. Fla. Dep't of Educ.*,
142 F.4th 1286 (11th Cir. 2025) ................................................ 24

**Constitutional Provisions**

U.S. Const. amend. X. ....................................................................... 49

**Statutes and Rules**

12 U.S.C. § 2601 ............................................................................ 1, 10

12 U.S.C. § 510 ...................................................................................... 1

15 U.S.C. § 1601 ........................................................................ 1

15 U.S.C. § 1602 .......................................................... 9, 39, 40, 41

15 U.S.C. § 1604 .............................................................. 10, 35

15 U.S.C. § 1638 ........................................................................ 9

*15 U.S.C. § 1639c 1, 9, 11, 13, 15, 25, 26, 30, 31, 32, 33, 34, 36, 55, 56, 1

28 U.S.C. § 1292 ........................................................................ 5

28 U.S.C. § 1331 ........................................................................ 5

28 U.S.C. § 1346 ........................................................................ 5

5 U.S.C. § 702 ......................................................................... 63

5 U.S.C. § 706 ......................................................................... 33

Cal. Fin. Code § 22680 ............................................................... 14

Cal. Fin. Code § 22684 ........................................................... 13, 14

Cal. Fin. Code § 22686 ............................................................... 14

Cal. Fin. Code § 22689 ............................................................... 14

Cal. Sts. & High. Code § 5898.16 ................................................. 14

Cal. Sts. & High. Code § 5898.17 ................................................. 13

Fed. R. App. P. 4 ........................................................................ 5

Fla. Stat. § 163.081 ................................................ 13, 14, 41, 55, 56

Fla. Stat. § 163.083 ................................................................... 14

Fla. Stat. § 163.084 ................................................................... 14

Fla. Stat. § 197.3632 .................................................................. 55

Pub. L. 90-321 Stat. 146 ............................................................... 8

Pub. L. No.90-321 .......... 10

**Regulations**

12 C.F.R. § 1026 .......... 9, 10

12 C.F.R. pt. 1008 .......... 11, 33

46 Fed. Reg. 50288 (Oct. 9, 1981) .......... 11

78 Fed. Reg. 6408 (Jan. 30, 2013) .......... 11, 12

*90 Fed. Reg. 2434 (Jan. 10, 2025) . 2, 3, 6, 7, 8, 10, 11, 13, 15, 16, 17, 19, 25, 31, 32, 33, 34, 35, 37, 40, 41, 42, 43, 44, 46, 47, 48, 49, 55, 56, 57, 58, 63

**Other Authorities**

Am. Bankers Ass'n, Comment Letter on Proposed Rule to PACE (July 26, 2023) .......... 19

Credit Union Nat'l Ass'n, Comment Letter on Proposed Rule to PACE (July 26, 2023) .......... 19

*Debtor*, 4 Oxford English Dictionary 316 (J.A. Simpson & E.S.C. Weiner, eds., 2d ed. 1989) .......... 39, 40

H.R.1958, 115th Cong. (2017) .......... 14

Renew, Supplemental Comment Letter on Proposed PACE Rule (July 11, 2024) .......... 47

Residential Property Assessed Clean Energy Financing (Regulation Z), Unified Agenda of Federal Regulatory & Deregulatory Actions, RIN 3170-AA84 (Consumer Fin. Prot. Bureau, Fall 2024) .......... 18

Residential Property Assessed Clean Energy Financing (Regulation Z), Unified Agenda of Federal Regulatory & Deregulatory Actions, RIN 3170-AA84 (Consumer Fin. Prot. Bureau, Spring 2024) .......... 17

S.838, 115th Cong. (2017) .......... 14

*Siobhan McAlister & Ryan Sandler, *Property Assessed Clean Energy (PACE) Financing and Consumer Financial Outcomes*, CFPB (May 2023) .......... 3, 16, 44, 45, 47, 48

*The Federalist* No. 32 (Alexander Hamilton) (Jacob E. Cooke ed., 1967) .......... 51, 53

## INTRODUCTION

Property Assessed Clean Energy ("PACE") is a sovereign initiative that some States have adopted to encourage energy efficient and weather-hardening home-improvement projects through voluntary tax assessments. PACE assessments remain tied to property regardless of who owns the property, are never reported to a credit bureau, and do not appear on any homeowner's credit report. Because of PACE's unique structure, from the time that PACE began until the Rule at issue, every regulator, State, and PACE administrator understood that PACE is not subject to federal consumer protection laws such as the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq*. ("TILA"), Secure and Fair Enforcement for Mortgage Licensing Act, 12 U.S.C. §§ 510 *et seq*. ("SAFE Act"), or the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601 *et seq* ("RESPA"). States thus stepped into this void, enacting their own robust protections.

In 2017, Congress became involved by enacting 15 U.S.C. § 1639c(b)(3)(C)(ii) ("Section 307"), as part of the Economic Growth, Regulatory Relief, and Consumer Protection Act ("EGRRCPA"). Section 307 directed the Consumer Financial Protection Bureau (together with the Consumer Financial Protection Bureau Director, the "CFPB") to

"prescribe regulations that carry out the purposes of [TILA's ability-to-repay provision] and apply [TILA's related civil liability provisions] with respect to violations [of that ability-to-repay provision] with respect to [PACE] financing" while "account[ing] for the unique nature of [PACE]," 15 U.S.C. § 1639c(b)(3)(C)(ii). That should have been a straightforward enough assignment for CFPB: adopt a rule that carries out the purposes of TILA's ability-to-pay and related liability provisions and call it a day.

But CFPB unilaterally decided that Congress' directive in Section 307 was not expansive enough for CFPB's bureaucratic ambitions. So CFPB reached back to a theory that some plaintiffs had invented a couple of years prior, when they brought failed lawsuits against PACE administrators alleging that PACE was TILA credit all along. With this new theory now its fueling its principle, CFPB adopted the rule at issue here, purporting to apply nearly *all* TILA provisions as well as portions of SAFE and RESPA to PACE. *See* Residential Property Assessed Clean Energy Financing (Regulation Z), 90 Fed. Reg. 2434 (Jan. 10, 2025) ("Rule"). Understanding that compliance would take many months, CFPB set an aggressive 13-month deadline—March 1, 2026—for PACE companies to meet the Rule's new, burdensome requirements. *See id.*

at 2434. To justify its circumvention of Section 307, CFPB relied on its PACE Report, Siobhan McAlister & Ryan Sandler, *Property Assessed Clean Energy (PACE) Financing and Consumer Financial Outcomes*, CFPB (May 2023)[1] ("PACE Report"), which improperly excluded certain consumers and skewed the data in a clumsy attempt to justify the burdensome Rule.

Plaintiff-Appellant Building Resilient Infrastructure & Developing Greater Equity, Inc. ("BRIDGE"), a trade association comprised of residential PACE administrators, challenged the Rule and moved for a preliminary injunction—supported by briefing, undisputed declarations detailing irreparable harm, court-ordered joint supplemental briefing, and two oral arguments. The District Court then denied the preliminary injunction motion in a brief order, which order did not meaningfully address any of BRIDGE's arguments or irreparable harm showing.

Yet, BRIDGE did establish a substantial likelihood of success on the merits, irreparable harm absent injunctive relief, and all equitable

---

[1] Available at https://files.consumerfinance.gov/f/documents/cfpb_pace-rulemaking-report_2023-04.pdf (all websites last visited December 23, 2025). This Court "take[s] judicial notice of agency records and reports" "[a]bsent some reason for mistrust." *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 533–34 (11th Cir. 2013).

considerations. BRIDGE demonstrated substantial likelihood of success on its argument that the Rule exceeds CFPB's limited statutory authority under Section 307, which only directed CFPB to issue regulations to carry out the purposes of TILA's ability-to-repay and related civil liability provisions "with respect to [PACE]," and requires accounting for PACE's "unique nature." BRIDGE also showed that the Rule is arbitrary and capricious because it relies upon the flawed CFPB PACE Report, which cherry-picked a nonsensical control group, making all of the Report's conclusions irrelevant. And the Rule violates the Tenth Amendment by imposing federal regulations on state tax assessments. BRIDGE also presented undisputed evidence that, absent an injunction, its members will suffer substantial, unrecoverable financial harms as the Rule's March 1, 2026 compliance deadline approaches. As of this appeal, BRIDGE's members have already expended many hundreds of thousands of dollars preparing for compliance with the Rule and expect to spend more unless the Rule is enjoined—monetary losses which cannot be recouped from the CFPB and thus constitute irreparable harm. And, most devastatingly, BRIDGE members expect volume loss up to 78% if the Rule actually takes effect on March 1, 2026.

This Court should reverse the District Court's denial of BRIDGE's motion for preliminary injunction.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1346, as BRIDGE's Complaint asserted federal-law claims against CFPB under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*; *see* App'x.11–76.[2] On June 5, 2025, BRIDGE moved for a preliminary injunction against the Rule. R.23. Then, on November 3, 2025, the District Court issued an order denying BRIDGE's motion for preliminary injunction, App'x.541–44. This Court has subject-matter jurisdiction under 28 U.S.C. § 1292(a)(1), as the District Court's denial of interlocutory relief is appealable as of right. BRIDGE timely filed its notice of appeal on November 19, 2025, R.58, within 30 days after the denial of interlocutory relief, Fed. R. App. P. 4(a)(1).

[2] Citations of "App'x" refer to the Appendix contemporaneously filed with this Plaintiff-Appellant's Opening Brief. Citations of "R." refer to the District Court docket in this case, *Building Resilient Infrastructure & Developing Greater Equity, Inc. v. Consumer Financial Protection Bureau, et al.*, No.8:25cv1367 (M.D. Fl.). Citations of "Dkt." refer to this Court's docket in this case, *Building Resilient Infrastructure & Developing Greater Equity, Inc. v. Consumer Financial Protection Bureau, et al.*, No.25-14109 (11th Cir.).

## STATEMENT OF THE ISSUES

1. Whether BRIDGE is likely to succeed on the merits of its claim that the Rule exceeds the CFPB's statutory authority.

2. Whether BRIDGE is likely to succeed on the merits of its claim that the Rule is arbitrary and capricious because of the Rule's reliance on the PACE REPORT.

3. Whether BRIDGE is likely to succeed on the merits of its claim that the Rule violates the Tenth Amendment to the Constitution.

4. Whether BRIDGE has demonstrated that it will be irreparably harmed by the Rule absent a preliminary injunction.

5. Whether BRIDGE has demonstrated that the balance of the equities and the public's interest weigh in favor a grant of preliminary-injunctive relief.

## STATEMENT OF THE CASE

### A. PACE

1. PACE allows States to advance sovereign policy goals by funding clean-energy, disaster-mitigation, and other critical infrastructure improvements through voluntary property tax assessments. App'x.78–80; *see* App'x.176–77; App'x.372–73; 90 Fed. Reg. at 2434–37. This is how PACE works: a PACE administrator—usually a private company

authorized to assist a government entity with its PACE program—works with consumers to determine project eligibility and vet contractors. *See* App'x.79, 94; App'x.186–204. Consumers pay no up-front costs; the administrator pays the contractor once the consumer certifies completion, then records a lien on the property in favor of the governmental entity sponsor. App'x.79. The resulting PACE assessment appears as a line item on the homeowner's property-tax bill, which tax the government collects with regular taxes, 90 Fed. Reg. at 2435; App'x.79, 99.

As CFPB has admitted, a "***PACE loan is tied to the property, not the property owner***," 90 Fed. Reg. at 2435 (emphasis added), such that the owner "has no personal liability to repay the assessment." App'x.78–79. PACE payment obligations remain with the property when sold, do not impact homeowners' credit scores, *id.*, and are not reported to credit bureaus, 90 Fed. Reg. at 2443, 2479. A homeowner entering a PACE transaction "has no personal liability to repay the assessment—it is attached solely to the property." App'x.78.

PACE began in 2008 and is most utilized in Florida and California. *See* 90 Fed. Reg. at 2435. These States adopted regulatory regimes

"tailored to the unique nature of PACE," App'x.79, 93–94, providing robust consumer protections, *see* App'x.93–94; App'x.186–204; 90 Fed. Reg. at 2437–38. Most relevant are three States—Florida, California, and Missouri—which currently have "active" PACE programs, although "19 States plus the District of Columbia [ ] currently have enabling legislation for residential PACE financing programs." 90 Fed. Reg. at 2435.

2. PACE has never been subject to federal regulation, and Congress recently stepped in to require CFPB to issue narrow PACE ability-to-repay regulations. Some background is helpful to understand Congress' recent action.

In 1968, Congress enacted the TILA, 15 U.S.C. §§ 1601 *et seq.*, Title I of the Consumer Credit Protection Act, Pub. L. 90-321, 82 Stat. 146, requiring creditors "to disclose information [to consumers] relating to such things as finance charges, annual percentage rates of interest, and borrowers' rights," *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 54 (2004) (citing 15 U.S.C. §§ 1631–1632, 1635, 1637–39), and to comply with certain other rules for "consumer credit transaction[s]," such as rules for lending requirements relating to residential mortgages, *id.*; *see*

15 U.S.C. § 1639c. TILA's requirements only apply to transactions where a creditor offers or extends credit to a consumer, *see* 12 C.F.R. § 1026.1(c); *see also* 15 U.S.C. § 1602(f), (i)—with "credit" defined as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment," 15 U.S.C. § 1602(f), and "consumer" defined as a "natural person" to whom credit is extended, *id.* § 1602(i).

TILA imposes various obligations on a creditor who lends credit to a consumer in the form of "a residential mortgage loan." For example, TILA requires a creditor extending "a residential mortgage loan" to a consumer to ensure that "the consumer has a reasonable ability to repay the loan, according to its terms, and all applicable taxes, insurance (including mortgage guarantee insurance), and assessments." *Id.* § 1639c(a)(a). Further, creditors lending certain residential mortgage loans subject to both TILA and to RESPA must also provide required TILA disclosures to the consumer "not later than three business days after the creditor receives the consumer's written application, which shall be at least 7 business days before consummation of the transaction." *Id.* § 1638(b)(2)(A). A creditor's failure to comply with these TILA requirements (like other TILA requirements) can "subject[ ] a lender to

criminal penalties for noncompliance," *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998) (citing 15 U.S.C. § 1611), as well as to "civil liability," *Koons*, 543 U.S. at 54 (citing 15 U.S.C. § 1640).

CFPB is responsible for enforcing TILA and "prescrib[ing] regulations to carry out [TILA's] purposes." 15 U.S.C. § 1604(a). Those regulations are found within "Regulation Z," 12 C.F.R. § 1026, originally promulgated by the Federal Reserve Board ("Board"), *see Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 235–38 (2004). Regulation Z also implements the requirements of certain related provisions of RESPA, 12 U.S.C. §§ 2601 *et seq.*, which sets forth additional disclosure requirements for mortgage loan transactions and "effect[s] certain changes in the settlement process for residential real estate" that are designed to give consumers "greater and more timely information on the nature and costs of the settlement process," 90 Fed. Reg. at 2442.

The Board had authority to regulate under TILA until 2010, Pub. L. No.90-321, § 105; 15 U.S.C. § 1604 (1968), when Congress created CFPB and gave it TILA-enforcement authority through the Dodd-Frank Act, *see* 90 Fed. Reg. at 2441. Dodd-Frank also expanded TILA's requirements for mortgage loans, requiring creditors of mortgage loans

to ensure that consumers have "a reasonable ability to repay." 15 U.S.C. § 1639c(a). In 2013, CFPB issued a rule implementing this requirement, 78 Fed. Reg. 6408 (Jan. 30, 2013), which rule also subjected financial instruments considered consumer "credit" under TILA to certain RESPA disclosure requirements, *id.* at 6419, 6420–23, while also requiring "[mortgage] loan originator[s]" to comply with certain SAFE Act requirements, *id.* at 6504 n.127; 90 Fed. Reg. at 2495; *see* 12 C.F.R. pt. 1008.

At the time of Congress' enactment of Section 307 in 2018, it was universally understood by every regulator, State, and PACE administrator that TILA, RESPA, and the SAFE Act did not apply to tax assessments like PACE. The understanding that TILA did not apply to tax assessments stretched back to the beginning of TILA, and the Board later issued "official staff commentary to Regulation Z" (TILA's implementing regulation) in 1981, explaining that "[t]ax liens" and "tax assessments" are not "credit" under TILA. 46 Fed. Reg. 50288, 50292 (Oct. 9, 1981). Thus, "States . . . and municipalities have long used their powers to assess levies on real property to finance community improvements," and States enacted PACE in this same manner. *See*

*Cnty. of Sonoma v. Fed. Hous. Fin. Agency*, 710 F.3d 987, 990 (9th Cir. 2013). In 2011, CFPB adopted these commentaries, reaffirming that "tax liens" and "assessments" did not qualify as TILA "credit." *In re Hero Loan Litig.* ("Hero"), No.ED CV 1602478-AB, 2017 WL 3038250, at *3 (C.D. Cal. 2017); 78 Fed. Reg. at 6410–13. Even then, CFPB understood then that TILA did not apply to PACE because these commentaries "expressly exclude[d] 'tax liens' and 'tax assessments' from the definition of consumer 'credit.'" *Hero*, 2017 WL 3038250, at *3; 78 Fed. Reg. at 6410–13. As such, no PACE transaction ever needed to comply with TILA, RESPA, or the SAFE Act before the Rule.

Beginning in 2017, a few plaintiffs brought lawsuits under the novel theory that PACE is a "credit" transaction under TILA's 1968 definition, meaning that no one had noticed that every PACE transaction for the last decade was illegal. Courts easily rejected this theory, holding that "PACE assessments are obligations imposed on the property, not the homeowner, and they are collected in the same manner and at the same time as the general taxes of the city or county on real property"; that "they are not a debt incurred by the homeowner, the consumer or natural person to whom credit is extended"; and thus that they "cannot be a credit

transaction" under TILA. *Hero*, 2017 WL 3038250, at *3–4 (citations omitted); *Burke v. Renew Fin. Grp., Inc.*, No.2:21-CV-02938, 2021 WL 5177776, at *3 (C.D. Cal. Aug. 13, 2021); *Concepcion v. Ygrene, Inc.*, No.19-CV-1465, 2020 WL 1493617, at *4 (S.D. Cal. Mar. 27, 2020). Given this "unique" nature of PACE, *see* 15 U.S.C. § 1639c(b)(3)(C)(ii); *Hero*, 2017 WL 3038250, at *1–3, there is no record evidence of any PACE jurisdiction or administrator needing to comply with TILA.

Meanwhile, States adopted regulatory regimes "tailored to the unique nature of PACE." *Hero, 2017 WL 3038250*, at *3; *see id.* at *11; App'x.186–204; 90 Fed. Reg. at 2437–38. Most relevant are California's 2018 and Florida's 2024 reforms—enacted in the States with the most residential PACE, see 90 Fed. Reg. at 2437–38—which adopt sweeping consumer protections that: (1) require that, before entering PACE, property owners receive written disclosure of the PACE assessment's terms, Fla. Stat. § 163.081(4); Cal. Sts. & High. Code § 5898.17; (2) impose origination requirements governing the assessment's financing-to-value ratio, Fla. Stat. § 163.081(3)(a)(2); Cal. Fin. Code § 22684(h); (3) mandate that the current owner be current on all mortgage debt, not in bankruptcy, and own the property, Fla. Stat. § 163.081(3)(a)(8)–(9); Cal.

Fin. Code § 22684(a), (d)-(e); (4) provide the current owner a right to cancel the project within three (Florida) or five (California) days before the contract's execution, Fla. Stat. § 163.081(4)(a)(9); Cal. Sts. & High. Code § 5898.16(b); (5) require that contractors be registered and regulated, Fla. Stat. § 163.083; Cal. Fin. Code §§ 22680–82, 22689; and (6) regulate PACE administrators, Cal. Fin. Code §§ 22680 *et seq.*; Fla. Stat. § 163.084. Further, California imposes an ability-to-repay requirement for PACE by obligating administrators to determine that consumers have a reasonable ability to repay their assessments. Cal. Fin. Code §§ 22686–87. Florida takes a different repayment approach, providing that "[t]he total estimated annual payment amount for all financing agreements . . . on the residential property [must] not exceed 10 percent of the property owner's annual household income. Income must be confirmed using reasonable evidence and not solely by a property owner's statement." Fla. Stat. § 163.081(3)(a)(12).

3. Congress then stepped in. After rejecting proposed legislation that would have applied all of TILA to PACE, *see* H.R. 1958, 115th Cong. (2017); S. 838, 115th Cong. (2017), Congress in Section 307 adopted a provision mandating that CFPB adopt "regulations that carry out the

purposes of [TILA's ability-to-repay provision] and apply [TILA's related civil liability provisions] with respect to violations [of that ability-to-repay provision] with respect to [PACE] financing, which shall account for the unique nature of [PACE]," 15 U.S.C. § 1639c(b)(3)(C)(ii). Section 307 defines "the term 'Property Assessed Clean Energy [PACE] financing' [to] mean[ ] financing to cover the costs of home improvements that results in a tax assessment on the real property of the consumer." *Id.* § 1639c(b)(3)(C)(i).

### B. The Final Rule

On December 17, 2024, almost seven years after Congress enacted Section 307 of EGRRCPA, CFPB promulgated its Final Rule, adopting the same failed theory that PACE falls within TILA's 1968 definition of "credit" and thus has always been "subject to" TILA. *See* 90 Fed. Reg. at 2449. Under the Rule, virtually all TILA provisions apply to PACE, and PACE companies must prepare to comply with these burdensome new requirements. *See id.* CFPB also now imposes RESPA and SAFE Act requirements on PACE. *Id.* at 2442, 2445–53, 2495. The RESPA requirements include a disclosure regime mandating provision of "Closing Disclosure" and "Loan Estimate" forms to consumers, *id.*

at 2452, and a waiting period before entering PACE, *id.* at 2454–55. The SAFE Act obligations require fingerprinting, testing, and licensing of all individuals deemed to be PACE "loan originators." *Id.* at 2495. The Rule also applies "the TILA-RESPA waiting period" to PACE transactions, requiring that any estimate for PACE incur a seven-day waiting period before the consumer can consummate the transaction. *Id.* at 2455. Understanding that compliance would take many months, CFPB set a 13-month deadline—March 1, 2026—for PACE to meet the Rule's burdensome requirements. *See id.* at 2434.

As claimed support for these features of the Rule, CFPB relied on its PACE Report, referencing the Report repeatedly. *Id.* at 2440; *see generally id.* The Report conducts its analysis by studying two groups of consumers: a control group (those who applied for PACE transactions, were approved, but did not proceed with the transactions), and a test group (those who applied, were approved, and did proceed with the PACE transactions). PACE Report at 26–27. CFPB limited the PACE Report analysis to data from between July 2014 and June 2020. *Id.* at 8. The PACE Report found only a 2.5 percentage point difference in consumer delinquency between the control and test groups over a two-year span

following PACE transaction origination, 90 Fed. Reg. at 2440, but the Report's methodology—especially its nonsensical control group design—is so flawed as to makes its findings meaningless, *see infra* pp.42–49.

### C. Procedural Background

1. CFPB originally scheduled the Rule's publication for May 2025 under the Spring 2024 Unified Agenda. Property Assessed Clean Energy Financing, Unified Agenda of Federal Regulatory & Deregulatory Actions, RIN 3170-AA84 (Consumer Fin. Prot. Bureau, Spring 2024).[3] But, when CFPB published the Fall 2024 Unified Agenda in December 2024, CFPB accelerated the timeline six months to publish the Rule in December 2024 before the change in the Presidential administrations. *See* Residential Property Assessed Clean Energy Financing (Regulation Z), Unified Agenda of Federal Regulatory & Deregulatory Actions, RIN 3170-AA84 (Consumer Fin. Prot. Bureau, Fall 2024);[4] *Regulatory Agenda Outlines Upcoming Rules from CFPB, FinCEN, Federal Reserve*, ABA

---

[3] Available at https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202404&RIN=3170-AA84. *See supra* p.3 n.1.

[4] Available at https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202410&RIN=3170-AA84. *See supra* p.3 n.1.

Banking J. (Dec. 17, 2024) (indicating CFPB released the Fall 2024 Unified Agenda in December 2024).[5]

On February 3, 2025, following the inauguration of the new President in January 2025, CFPB acting Director Vought directed CFPB "[t]o suspend the effective dates of all final rules that have been issued or published but that have not yet become effective." Am. Notice of Filing, *Nat'l Treasury Emps. Union v. Vought*, 1:25-cv-00381-ABJ (ECF 23-2), at 1 (D.C. Cir. Feb. 21, 2025. Thus, months after the Rule was published, it was unclear whether the Rule would go into effect. During this time, CFPB publicly announced it would reconsider all of its actions and refused to defend many actions in court. *See* App'x.489 at 43:5–20.

Despite retreating from most rulemaking and litigation, CFPB decided the Rule would be one of the few CFPB actions that it would defend. *See id.* CFPB's unexpected decision was inconsistent with much else that the CFPB had done, but consistent with mortgage industry's dislike of PACE. *See* Am. Bankers Ass'n, Comment Letter on Proposed

[5] Available at https://bankingjournal.aba.com/2024/12/regulatory-agenda-outlines-upcoming-rules-from-cfpb-fincen-federal-reserve/.

Rule on Residential PACE (July 26, 2023);[6] Credit Union Nat'l Ass'n, Comment Letter on Proposed Rule on Residential PACE (July 26, 2023); *see also* 90 Fed. Reg. at 2442.[7]

2. Once it was clear that CFPB would not withdraw the Rule, BRIDGE filed its four-count APA complaint on May 28, 2025, with three of those counts relevant here. *See infra* p.21–23.

BRIDGE is a trade organization whose mission is to promote and advocate on behalf of the residential PACE industry. App'x.383. Renew Financial Group, LLC ("Renew") and Ygrene Energy Fund, Inc. ("Ygrene") are two BRIDGE members, who provide affordable PACE for renewable-energy, energy-efficiency, resiliency, and other critical home improvements, primarily serving lower-income homeowners who often lack access to traditional credit. App'x.143–50; App'x.385–87; App'x.392–93. Renew, founded in 2008, manages PACE transactions in Florida and California, partners with over 5,156 mostly small-business contractors, and in fiscal year 2024 alone facilitated over $215 million in PACE for

---

[6] Available at https://www.regulations.gov/comment/CFPB-2023-0029-0091. This Court "take[s] judicial notice of agency records and reports" "[a]bsent some reason for mistrust." *Rich*, 716 F.3d at 533.

[7] Available at https://www.regulations.gov/comment/CFPB-2023-0029-0085.

more than 400 communities, creating and sustaining over 9,000 jobs and maintaining a high repayment success rate with a delinquency rate of about 1–1.487%. App'x.94; App'x.385–87. Ygrene, founded in 2010 to remove barriers to financing energy-efficient home improvements, has financed PACE projects ranging from clean-energy improvements, to disaster mitigation, and to other necessary repairs; its customers are predominantly moderate-income, have a 99% repayment success rate with a current delinquency rate of 1.2%. App'x.149–50; App'x.392–94. Both Renew and Ygrene adopted their own robust consumer protections—such as prohibitions on financing properties with reverse mortgages or nonprofit-gifted properties, and on negative amortization, balloon payments, and prepayment penalties—in addition to State requirements, leading to "extraordinarily low delinquency rates and zero foreclosures" as of 2018. App'x.42; App'x.94; App'x.385–88; App'x.392; App'x.115–16; App'x.149–50. After CFPB proposed what would become the Rule, Renew, Ygrene, and others—including eight state attorneys general and additional PACE administrators—submitted extensive comments explaining that the proposal was unlawful in part for the same

reasons BRIDGE has raised in this case. App'x.78–98; App'x.124–40; App'x.110–22; App'x.177–276.

3. BRIDGE moved for a preliminary injunction shortly after filing its Complaint, invoking three of its four claims: (1) CFPB exceeded statutory authority, App'x.43–51, (2) CFPB acted arbitrarily and capriciously by relying on the PACE Report, App'x.68–74, and (3) CFPB violated the Tenth Amendment, App'x.51–63. *See* R.23. BRIDGE supported its motion for preliminary injunction with undisputed declarations showing that its members are currently incurring and, unless the Rule is enjoined, will continue to incur, unrecoverable compliance costs, *see* App'x.382–96. For example, Renew projected that, before the Rule's March 1, 2026 effective date, it will incur approximately $2,528,000 in compliance costs. App'x.387–89. Likewise, Ygrene already reallocated internal resources and retained outside legal and compliance counsel to assess the Rule and plan for implementation, spending nearly $100,000 and anticipating another $500,000 in related costs, and projects more than $1,000,000 in technology and project-management implementation expenses, ongoing outside-technology expenditures over $1,000,000 annually, and at least eight additional full-time employees

costing $880,000. App'x.394–95. While these expenditures before the Rule takes effect are harmful enough, the harm that BRIDGE's members will suffer after the Rule takes effect on March 1, 2026, are worse. Renew anticipates losing nearly 72% of its funding volume after the Rule takes effect, App'x.390, while Ygrene expects to lose approximately 78% of its funding volume, App'x.395–96.

The District Court held two preliminary-injunction hearings and, ultimately, denied BRIDGE's motion in a brief order, which contained only one paragraph of reasoning. In that paragraph, the District Court stated that BRIDGE had not "establish[ed] a substantial likelihood of success on the merits and irreparable injury," "[b]ased on the current record," but that this "should not be read to be a predictive ruling upon the merits of Plaintiff's claims." App'x.543–44. Instead, the Court denied the motion because it viewed the questions as "highly complex" and "better resolved at the summary judgment stage," after it receives "a more developed factual record and more detailed briefing." App'x.544. That said, the District Court separately cast doubt on BRIDGE's Tenth Amendment argument in a footnote and encouraged BRIDGE to pursue other arguments. App'x.544 at n.2.

4. BRIDGE appealed the District Court's denial of the preliminary-injunction motion on November 19, 2025, R.58. BRIDGE moved this Court for an injunction pending appeal. Dkt.8. This Court denied that motion. Dkt.13.

5. Meanwhile, the case proceeded to the summary-judgment stage. The parties submitted cross-summary-judgment motions, *see* Rs.57, 62, 63, 66, and the District Court held a hearing on December 16, 2025. R.71. The Court then requested proposed conclusions of law by January 5, 2026, with no date on which it is expected to issue a final decision.

## STANDARD OF REVIEW

The Court "review[s] a district court's decision to deny a preliminary injunction for abuse of discretion." *Barber v. Governor of Ala.*, 73 F.4th 1306, 1316 (11th Cir. 2023) (citation omitted). "In so doing, [the Court] review[s] the findings of fact of the district court for clear error and legal conclusions *de novo*." *Id.* (citation omitted). A plaintiff seeking a preliminary injunction must satisfy four factors: "(1) whether there is a substantial likelihood that the party applying for preliminary relief will succeed later on the merits; (2) whether the applicant will suffer an irreparable injury absent preliminary relief; (3) whether the

harm that the applicant will likely suffer outweighs any harm that its opponent will suffer as a result of an injunction; and (4) whether preliminary relief would disserve the public interest." *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010); *accord Nken v. Holder*, 556 U.S. 418, 434 (2009). "When the state is a party, the third and fourth considerations are largely the same." *Scott*, 612 F.3d at 1290. The first factor—the movant's likelihood of success—depends upon legal conclusions, and so this Court's review of that factor is de novo. *See Fla. Agency for Health Care Admin. v. Adm'r for Centers for Medicare & Medicaid Servs.*, No. 24-10875, 2025 WL 3496406, at *5 n.1 (11th Cir. Dec. 5, 2025). Where the Court must review an agency's interpretation of a statute, the Court must exercise its independent judgment and give no deference to the agency. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391–92 (2024). The Court reviews the remaining three factors injunctive for an abuse of discretion. *Wood v. Fla. Dep't of Educ.*, 142 F.4th 1286, 1289 (11th Cir. 2025).

## SUMMARY OF THE ARGUMENT

I. BRIDGE established it has a strong likelihood of success on each of the three claims at issue in this appeal.

*First*, BRIDGE demonstrated with a strong likelihood of success that the Rule exceeds Congress' narrow delegation to CFPB to "prescribe regulations that carry out the purposes of" the TILA ability-to-repay provision and related civil liability provision "with respect to [PACE]," while "account[ing] for the unique nature of [PACE]." 15 U.S.C. § 1639c(b)(3)(C)(ii). CFPB instead applied all of TILA, and parts of RESPA and the SAFE Act by reinterpreting TILA's 1968 "consumer credit" definition to cover PACE belatedly. But CFPB's interpretation of "consumer credit" renders Section 307 unnecessary and illogical, and, in any event, PACE would not be consumer credit even without Section 307 because—as every court to have considered this same issue pointed out and as CFPB concedes in its own Rule—"PACE [ ] is tied to the property, not the property owner." 90 Fed. Reg. at 2435.

*Second*, BRIDGE is likely to succeed on its argument that the Rule is arbitrary and capricious due to its reliance on the PACE Report. The PACE Report has multiple flaws, including that its all-important control group analysis is biased and nonsensical. The PACE Report's control group improperly combines consumers from substantially different situations: consumers who decided not to fund their projects at all; and

those who were approved for PACE but declined to use PACE. Yet including those who decide not to go forward with PACE or any other funding option obviously skews the results in the control group, since those who did not take financing for their projects at all are not comparable to those who opted into PACE tax assessments. The Report is flawed in additional respects, including that it relied on historical data obtained before expansive and beneficial State consumer regulations became effective in 2019, and that it excluded 22% of PACE applicants because it could not locate their credit histories.

*Third*, BRIDGE proved with a strong likelihood of success that the Rule violates the Tenth Amendment by interfering with States' sovereign taxing power and commandeering State officials to implement a federal program. PACE results in a "tax assessment on the real property of the consumer," 15 U.S.C. § 1639c(b)(3)(C)(i), and federal interference with that tax assessment is an unconstitutional "direct abridgment" of the States' taxation authority. Further, by placing TILA obligations on government sponsors in a PACE transaction, Section 307 and the Rule unconstitutionally commandeers public officials to administer and enforce a federal regulatory program.

II. BRIDGE also showed that its members will suffer irreparable harm absent a preliminary injunction. Before the March 1, 2026 effective date, Renew projects that it will incur approximately $2,528,000 in compliance costs across legal, engineering, product, project management, and operations, App'x.387–89. Ygrene has already reallocated internal resources and retained outside legal and compliance counsel to assess the Rule and plan for implementation, spending nearly $100,000 and anticipating another $500,000 in related costs over the next year. App'x.394–95. Ygrene projects technology and project management implementation costs exceeding $1,000,000, with ongoing outside technology expenditures expected to surpass $1,000,000 annually. *Id.* Ygrene will need at least eight additional full-time employees at an added cost of $880,000. App'x.395. And Renew and Ygrene will suffer catastrophic business losses after the Rule takes effect. BRIDGE's members have provided undisputed declarations that their business volume will drastically decrease after the Rule's effective date, with 72% reduction for Renew and 78% reduction for Ygrene. App'x.390; App'x.395–96.

III. BRIDGE also showed that the balance of the equities and public interest favor an injunction. PACE provides public benefits, including giving homeowners a method to fund critical home-improvement projects, such as fire, hurricane, and flood hardening, without incurring personal debt while enabling small business contractors to construct the project improvements. And the public has no interest in the CFPB enforcing an illegal rule.

## ARGUMENT

### I. BRIDGE Is Likely To Succeed On The Merits

Under the APA, a court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C); "contrary to constitutional right, power, privilege, or immunity," *id.* § 706(2)(B); "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A); or is taken "without observance of procedure required by law," *id.* § 706(2)(D). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," without "defer[ring] to an agency interpretation of the law simply because a statute is ambiguous." *Loper*, 603 U.S. 369, 412–13 (2024); *see also id.* at 391–92.

BRIDGE has established a substantial likelihood of success on the merits for three independently sufficient reasons. First, the Rule exceeds CFPB's statutory authority. *Infra* Part I.A. Second, CFPB acted arbitrarily and capriciously by relying upon the irredeemably flawed PACE Report. *Infra* Part I.B. Third, the Rule violates the Tenth Amendment by infringing upon States' taxation authority and commandeering public officials. *Infra* Part I.C.

### A. The Rule Exceeds CFPB's Statutory Authority

This Court interprets statutes according to the "plain meaning" of their text, understood "in their context and . . . their place in the overall statutory scheme." *United States v. Crape*, 603 F.3d 1237, 1242–43, 45 (11th Cir. 2010) (citations omitted). The Court must "presume" that Congress "says in a statute what it means and means in a statute what it says." *Id.* (citations omitted). The more specific statute governs, *see RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012), and the more recent statute controls the older statute; *Tug Allie-B, Inc. v. United States*, 273 F.3d 936, 941 (11th Cir. 2001). Further, the Court avoids "interpreting any statutory provision in a manner that would render another provision superfluous." *Bilski v. Kappos*, 561 U.S.

593, 595 (2010). "This principle, of course, applies to interpreting any two provisions in the U. S. Code, even when Congress enacted the provisions at different times." *Id.* at 608. The Court "must exercise independent judgment in determining the meaning of statutory provisions" including when deciding whether a federal agency acted within its statutory authority. *Loper*, 603 U.S. at 412.

Here, Congress defined the relationship between TILA and PACE in Section 307 by granting CFPB narrow authority to "prescribe regulations that carry out the purposes of subsection (a) [of 15 U.S.C. § 1639c, within TILA]" and to "apply section 1640" "with respect to [PACE]," while also requiring that such regulations "account for the unique nature of [PACE]." 15 U.S.C. § 1639c(b)(3)(C)(ii). Given Section 307's unambiguous directive, CFPB *only* had the authority to issue a rule that achieves the purposes of Sections 1639c(a) and 1640. *See Crape*, 603 F.3d at 1242–43, 1245. The Rule exceeds the limited authority Congress delegated to CFPB by applying essentially all of TILA, and portions of RESPA and the SAFE Act, to PACE, *infra* pp.31–41, while also failing to "account for the unique nature of [PACE]." 15 U.S.C. § 1639c(b)(3)(C)(ii); *infra* pp.33–34.

1. The Rule far exceeds CFPB's statutory authority by applying nearly all TILA provisions, parts of RESPA, and the SAFE Act to PACE. *See* 90 Fed. Reg. at 2442, 2495. Section 307 does not empower CFPB to apply all TILA provisions to PACE, nor does it even mention RESPA or the SAFE Act, *see* 15 U.S.C. § 1639c(b)(3)(C), rendering the Rule unlawful. **<u>The core legal issue here is that simple</u>**: "an agency's power" is "limited to the authority delegate[d] to it by Congress," *Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080, 1084–85 (11th Cir. 2013), and an agency "literally has no power to act" unless "Congress authorizes it to do so," *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (citations omitted). And, "[w]here Congress knows how to say something but chooses not to, its silence is controlling." *Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1224–25 (11th Cir. 2009) (citation omitted) ("impermissible" for a court to "add words" to a statute).

Congress established the relationship between TILA and PACE through Section 307, which gave CFPB limited statutory authority to "prescribe regulations that carry out the purposes of subsection (a) [of 15 U.S.C. § 1639c, within TILA]" and to "apply section 1640" "with respect

to [PACE]," while also requiring that such regulations "account for the unique nature of [PACE]." 15 U.S.C. § 1639c(b)(3)(C)(ii).

The Rule goes beyond this narrow statutory authority by applying almost all of TILA, portions of RESPA, and the SAFE Act to PACE, which provides enough grounds for the Court to set the entire Rule aside. *See* 90 Fed. Reg. at 2442, 2495; 15 U.S.C. § 1639c(b)(3)(C). Nothing in Section 307's text authorizes CFPB to determine PACE is a mortgage and apply nearly all TILA provisions to PACE, and Congress did not even mention RESPA or the SAFE Act in Section 307. *See* 15 U.S.C. § 1639c(b)(3)(C); *Everglades*, 570 F.3d at 1224–25. The Rule also does not "carry out the purposes of" TILA's ability-to-repay provision. *Contra* 15 U.S.C. § 1639c(b)(3)(C)(ii). Instead, the Rule requires TILA-RESPA integrated disclosure requirements which mandate disclosure of certain information to consumers about the key features, costs, and risks of PACE for which they are applying. 90 Fed. Reg. at 2452–54. A federal disclosure requirement has no bearing on whether a property owner will be able to pay the property-tax assessment as a result of the PACE transaction—which is the sole "purpose[ ] of" TILA's ability-to-repay provision, 15 U.S.C. § 1639c(b)(3)(C)(ii) (notwithstanding that State law

already requires the disclosure of that information to consumers, *supra* pp.13–14). The SAFE Act, for its part, imposes burdensome requirements on contractors to force them to become licensed mortgage lenders. *See* 90 Fed. Reg. at 2495; *see* 12 C.F.R. pt. 1008. Federal requirements for *contractors*—which, again, are already addressed by State law regulating PACE, *supra* pp.13–14—have nothing to do with whether the property owner will have the ability to repay the property-tax assessments on the property. The Rule's imposition of the SAFE Act does not take into account "the unique nature of [PACE]." 15 U.S.C. § 1639c(b)(3)(C)(ii). CFPB's application of these provisions to PACE impermissibly "add[s] . . . words" to Section 307, *Everglades*, 570 F.3d at 1224, and exceeds CFPB's "statutory authority," rendering the Rule unlawful, *Loper*, 603 U.S. at 412; *see* 5 U.S.C. § 706(2)(C).

Further—and independently fatal to the entire Rule—the Rule's mechanical application of TILA's ability-to-repay provision to PACE violates Section 307 for the *additional* reason by failing to "account for the unique nature of [PACE]." 15 U.S.C. § 1639c(b)(3)(C)(ii). PACE is "unique," *id.*, in multiple ways. PACE assessments are tax assessments on property, not debt obligations on individuals, *Hero*, 2017 WL 3038250,

at *3, a local government entity sponsors and funds the PACE program, 90 Fed. Reg. at 2435; PACE is only available for projects the State selects that further its public-policy goals, *see* App'x.78–79; App'x.124–27; App'x.182–85; PACE's State- and local-government sponsors "have already adopted measures to ensure that consumers understand PACE transactions, are able to pay the assessments, and are not subject to unscrupulous sales practices," App'x.186–204; and PACE administrators (like BRIDGE's members) already voluntarily apply multiple underwriting practices to ensure property owners' ability to repay, *see* App'x.94. Ignoring these "unique" features, 15 U.S.C. § 1639c(b)(3)(C)(ii), the Rule merely asserts that applying TILA's "existing" ability-to-pay "regime" for "residential mortgage loans" was "appropriate for PACE," "notwithstanding certain characteristics of PACE financing or PACE programs discussed by commenters," 90 Fed. Reg. at 2465. This *ipse dixit* assertion is insufficient, *see Ala. Env't Council v. Adm'r, EPA*, 711 F.3d 1277, 1287–88 (11th Cir. 2013); *Animal Legal Def. Fund v. USDA*, 789 F.3d 1206, 1224 n.13 (11th Cir. 2015), as it does not adhere to Section 307's requirement to take into "account" the "unique nature" of PACE. 15 U.S.C. § 1639c(b)(3)(C)(ii).

2. The CFPB asserted that the Rule was legal because PACE has always been TILA "consumer credit" under the 1968 TILA statute, such that CFPB can promulgate rules regulating PACE under its general TILA authority in 15 U.S.C. § 1604(a), 90 Fed. Reg. at 2449, despite the Board's longstanding commentary that tax assessments were not TILA "consumer credit." *See supra* pp.8–13. This is wrong for two independently fatal reasons, each requiring vacatur of the Rule.

*First*, as a threshold matter and in an entirely dispositive manner, Section 307 controls the inquiry here, as Congress' most recent and definitive statement on the relationship between PACE and TILA. *See RadLAX*, 566 U.S. at 645; *Tug Allie-B*, 273 F.3d at 941. CFPB's interpretation of the 1968 TILA statute as already applying all of TILA to PACE would render Section 307 a nonsensical nullity, and is in violation of basic statutory interpretation principles.

In the most recent statute—Section 307—Congress defined the relationship between PACE and TILA in light of the uniform understanding that PACE was *not* consumer "credit" under TILA. *See Monsalvo v. Bondi*, 604 U.S. 712, 725 (2025) ("new provision[s]" presumptively "should be understood to work in harmony with" a

"longstanding administrative construction" and "what has come before" (citations omitted)). This understanding is reflected in Congress' express recognition that PACE is a "tax assessment." 15 U.S.C. § 1639c(b)(3)(C)(i). Until the Rule, the Board and CFPB had interpreted TILA to not apply to *any* tax liens or assessments, *supra* pp.8–13, and courts likewise affirmed that PACE does not constitute TILA consumer "credit." *Supra* pp.12–13 (citing cases). After some unsuccessfully proposed to impose all of TILA onto PACE, *supra pp*.14–15, Congress took the middle road and directed CFPB to carry out the purposes of particular parts of TILA with respect to PACE, while "account[ing] for the unique nature of [PACE]," 15 U.S.C. § 1639(b)(3)(C)(ii).

Congress' enactment of Section 307 created a "new provision" that "work[ed] in harmony with" the "longstanding administrative construction" of TILA. *Monsalvo*, 604 U.S. at 725 (citations omitted). Congress recognized that, under the existing legal landscape, PACE stood entirely outside of TILA's regime. *Supra* p.8–15. So, Congress passed Section 307, directing CFPB to issue ability-to-repay rules for PACE under TILA in *one* specific respect, while rejecting alternative proposals that would have fully subjected PACE to all of TILA (and

Congress did not even mention RESPA or the SAFE Act). *Supra* p.14–15. Thus, the "harmony," *Monsalvo*, 604 U.S. at 725, that Congress achieved here with Section 307 is a limited extension of CFPB's TILA authority to cover PACE with respect to one requirement—ability to repay.

The Rule's post-hoc reinterpretation of TILA's 1968 definition of "credit" as already applying to PACE renders Section 307 a nonsensical nullity. Under CFPB's reasoning, TILA *already* regulated voluntary tax assessments like PACE as "credit" when PACE first began in 2008. *See* 90 Fed. Reg. at 2449. Thus, the Rule asserts that the Board's and CFPB's *existing* TILA regulations *already* applied to PACE from the very moment States began creating PACE programs in 2008—a decade before Congress enacted Section 307 in 2018. *Supra* pp.14–15. This position, of course, makes Congress' judgment in Section 307 entirely unnecessary. ***After all, if TILA already covered PACE loans under TILA's 1968 consumer "credit" definition, Congress would have no reason at all to have enacted Section 307 in 2018, as TILA's existing regulation would have already applied those very provisions—***

***and, indeed, all provisions of TILA, and parts of RESPA and the SAFE Act—to PACE by TILA's existing operation***.

The Supreme Court's decision in *Bilski*, 561 U.S. 593, illustrates how this type of analysis works for statutes enacted at different times. *Bilski* considered whether "business methods" were patentable under the Patent Act of 1952 ("1952 Act"). *Id.* at 607. Before *Bilski*, the Federal Circuit had held that business methods were patentable under the 1952 Act. *See id.* at 600. Congress then responded with the "First Inventors Defense Act" ("1999 Act"), creating a defense to claims of infringement of "a method in [a] patent" and defining "method" as "a method of doing or conducting business." *Id.* at 607 (citations omitted) (alteration in original). After considering the 1999 Act's recognition of business-method patents, the Court concluded that the 1952 Act allowed business methods to be patentable. *Id.* at 607–08. Concluding otherwise would render the 1999 Act "meaningless" and violate the surplusage canon, which applies "even when Congress enacted the provisions [at issue] at different times." *Id.* The same dynamic in *Bilski* is present in this case. This Court must consider whether to interpret TILA's 1968 "consumer credit" definition (an older statute) as covering PACE, which

interpretation would render Section 307 (a newer statute) nonsensical. *Bilski* refused to interpret the 1952 Act (an older statute) to exclude business-method patents, as that interpretation would render the 1999 Act (a newer statute) superfluous. *Id.* So, under *Bilski*'s binding approach, this Court cannot interpret TILA's 1968 consumer credit definition as covering PACE, as that would render Section 307 nonsensical, notwithstanding that "Congress enacted the[se] provisions at different times." *Id.*

*Second*, even if Congress had never enacted Section 307, CFPB's claim that PACE is "consumer credit" under TILA would still fail.

TILA "credit" is a "right granted by a creditor to a *debtor* to defer payment of debt or to incur debt and defer its payment," and it applies only when a "creditor" extends debt to a "debtor" who is a "natural person." 15 U.S.C. § 1602(f), (i) (emphasis added). Consequently, TILA consumer "credit" is a debt-repayment obligation that a natural-person debtor incurs. *Id.* "Debtor" refers to "[o]ne who owes or is indebted to another." *Debtor*, 4 Oxford English Dictionary 316 (J.A. Simpson & E.S.C. Weiner, eds., 2d ed. 1989) ("OED"). For example, a "mortgage loan[ ]" qualifies as a TILA "consumer credit transaction," *Hero*, 2017 WL

3038250, at *2 (citations omitted), because it extends debt to "a consumer," 15 U.S.C. § 1602(dd)(2)—*i.e.*, a "natural person," *id.* § 1602(i). During a mortgage loan, the consumer incurs the repayment obligation for the mortgage and becomes a debtor because he or she is then "[o]ne who owes or is indebted to another," *Debtor*, OED, *supra*. This is why for mortgages, even after a home sale, the debt obligation follows the consumer debtor, *see Hero*, 2017 WL 3038250, at *2–3.

PACE lacks this critical feature of "consumer credit" because as CFPB itself admits, a "PACE loan is tied to the property, not the property owner." 90 Fed. Reg at 2435. Therefore, the property owner "has no personal liability to repay the assessment." App'x.78. Since PACE is tied to the property, the property owner cannot possibly be a "debtor" on that loan. This is why the PACE arrangement stays with the property after the property is sold. State law reaffirms this: "Under California law, a tax assessment lien on property does not constitute a personal debt owed by a consumer." *Hero*, 2017 WL 3038250, at *3; *accord Morgan v. Ygrene Energy Fund, Inc.*, No.S277628, 2025 WL 3483108, at *1 (Cal. Dec. 4, 2025) (requiring plaintiffs to "follow the applicable statutory procedures for challenging taxes" because "PACE assessments" are taxes). Likewise,

Florida recognizes that PACE remains with the property and so cannot be personal debt. *See Faber, Coe & Gregg of Fla., Inc. v. Wright*, 178 So.2d 51, 53 (Fla. Dist. Ct. App. 1965); Fla. Stat. § 163.081(8) (recognizing the assessment is tied to the property). This is also why PACE does not appear on homeowners' credit scores, App'x.79, and why PACE is not reported to credit bureaus, 90 Fed. Reg. at 2443, 2479.

The Rule claims that PACE obligations are "consumer credit" because "consumers who agree to PACE transactions are functionally responsible for ensuring their repayment." *Id.* at 2449. But whether a transaction is TILA "credit" turns on who is legally obligated to repay. *See supra* pp.39–40; 15 U.S.C. § 1602(f), (i). Here, the assessment runs with the property and so the owner has no personal liability to repay the PACE assessment. 90 Fed. Reg. at 2435; *see also* App'x.78. CFPB's "functional responsibility" theory also fails because consumers are "functionally responsible," 90 Fed. Reg. at 2449, for all their tax obligations—whether voluntarily or involuntarily imposed—yet CFPB concedes that "involuntary tax liens" and "involuntary tax assessments" "are not considered credit for purposes of the regulation." *Id.* at 2447.

"Functional responsibility," *id.* at 2449, thus cannot justify treating tax obligations running with property as TILA consumer "credit."

### B. CFPB Acted Arbitrarily And Capriciously By Relying On The Flawed PACE Report

1. Agency action is "arbitrary [and] capricious," 5 U.S.C. § 706, if the agency "has relied on factors [that] Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co. ("State Farm"),* 463 U.S. 29, 43 (1983). The APA's arbitrary-and-capricious-review standard requires agencies to "examine the relevant data and articulate a satisfactory explanation for its action," *id.* at 43 (citation omitted), and to "reasonably consider[ ] the relevant issues," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *accord Hewitt v. Comm'r of IRS*, 21 F.4th 1336, 1342 (11th Cir. 2021). Agency action must be both "reasonable and reasonably explained," meaning the agency must have "examined the relevant data and articulated a satisfactory explanation for its actions," *Bidi Vapor LLC v. FDA*, 134 F.4th

1282, 1284, 1286 (11th Cir. 2025) (citation omitted), based on the information contained and the grounds articulated in the "administrative record," *Salmeron-Salmeron v. Spivey*, 926 F.3d 1283, 1284, 1286 (11th Cir. 2019). A court may not "supply a reasoned basis for the agency's action" that the agency itself has not supplied. *State Farm*, 463 U.S. at 43 (citation omitted).

2. The Final Rule is arbitrary and capricious because CFPB relied extensively on the PACE Report to provide "data-based support" for the Rule, App'x.81; *see* App'x.214–26; 90 Fed. Reg. at 2476–82, and that Report is fatally flawed in several respects. The Report found that for consumers who applied for PACE between July 2014 and June 2020, PACE resulted in a 2.5 percentage point mortgage delinquency rate change over a two-year span versus a control group (comprising consumers who applied for PACE and were approved, but did not ultimately use PACE) following the PACE transaction's origination. CFPB used this flawed finding to justify the Rule's extensive regulations of PACE. 90 Fed. Reg. at 2440. CFPB's reliance on the Report was arbitrary and capricious given its numerous flaws—especially the flaw in control group, as described below.

*First* and most problematically, the PACE Report utilized an improper control group, which makes the Report's findings irrelevant. The Report relies upon comparing two groups of consumers: (1) a control group of those who applied for PACE, were approved, but did not ultimately proceed with PACE; and (2) a test group of those who applied, were approved, and did proceed with PACE. PACE Report at 6–27; *see* App'x.81–84; App'x.374–80; App'x.112–15. CFPB's comparison of outcomes between these groups formed the exclusive empirical basis for CFPB's justification for the Rule, as demonstrated by the Rule's numerous references to "PACE Report." 90 Fed. Reg. at 2477–78, PACE Report at 52.

The PACE Report's control group improperly combines consumers from substantially different situations and those in the Report's test group. Control-group consumers fall into two categories: (1) those consumers who decided not to fund their projects at all; and (2) those who funded their projects without choosing PACE. App'x.81–83; PACE Report at 27. ***But consumers who pay for home projects through PACE have materially different financial positions than consumers who choose not to obtain funding for their projects at***

***all***. *See* App'x.81–83. The current property owner with a PACE assessment must make annual tax payments unless the owner sells the property. Someone who receives a loan and becomes a debtor has to make monthly payments (even if he sells the property). In contrast, someone who decides to not go forward with the project or pays cash does not have to make any monthly or annual payment. *See* App'x.81–83; App'x.374–75; App'x.113; App'x.219–20. The Report's control group ignores this critical difference, meaning that control-group members were "not selected because they had assumed a comparable amount of debt" to each other or consumers in the test group who did enter PACE. *See* App'x.81–83; App'x.113; App'x.214–26; App'x.374–81; PACE Report at 27. This renders the Report's findings irrelevant because CFPB picked a control group skewed to its desired outcome and so the Rule is not "based on a consideration of the relevant factors" and "failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43; *see* App'x.214–26; App'x.374–81.

As several commenters noted during the rulemaking process, CFPB could have readily resolved this issue by using a control group consisting

of PACE-approved applicants who instead chose to become debtors in financing their home improvement projects, and then comparing their negative repayment outcomes to those of consumers who placed PACE obligations on their properties. *See* App'x.81–83; App'x.112–15; App'x.214–26; App'x.374–81. Had CFPB taken this logical approach, it would have found that those who moved forward with PACE tax assessments are less likely to default than property owners who financed their home improvement projects with loans. App'x.377–80; App'x.81–83. Yet, CFPB ignored this glaring flaw in the control group and relied on the PACE Report any way, rendering its action arbitrary and capricious. *See State Farm*, 463 U.S. at 43.

*Second*, the PACE Report's data is flawed because most consumers in its study applied for and/or obtained PACE *before* state-level reforms took effect—first in California in January 2019 and then in Florida in July 2024—which reforms produced beneficial results for consumers, App'x.380–81, including reducing negative impacts on PACE homeowners' credit condition, 90 Fed. Reg. at 2441 (recognizing that "the 2018 California PACE reforms . . . improved customer outcomes"); *see id.* at 2451 (recognizing reforms in state law since origination of PACE loans

in PACE Report); *id.* at 2437–38 (identifying Florida and Missouri reforms). Yet, the Report's dataset included only homeowners who applied for PACE between July 2014 and December 2019, almost all *before* California's far-reaching reforms took effect, and does not include those who entered PACE after Florida passed its widespread PACE reforms in 2024. *Id.* at 2440, 2476; Renew, Supplemental Comment Letter on Proposed PACE Rule, at 1–2 (July 11, 2024).[8] Thus, nearly two-thirds of the homeowners CFPB analyzed received PACE assessment before the far-reaching PACE reforms. 90 Fed. Reg. at 2440, 2476. The PACE Report's underlying data did not distinguish PACE homeowners between the relevant, post-reform period—which showed much better results—and the previous, less regulated period. *Id.*

While CFPB claims that the small sample of post-reform data included in the Report still shows increased mortgage delinquency rates, the Report itself noted that its post-reform data is "not statistically precise" and "likely to be noisy." PACE Report at 47–48. Further, the Rule relies on the Report's finding of a 2.5 percentage point difference in

[8] Available at https://www.regulations.gov/comment/CFPB-2023-0029-0134. *See supra* p.3 n.1.

mortgage delinquencies between the control and test groups. 90 Fed. Reg. at 2436; *see* App'x.81. Even under CFPB's flawed methodology, *supra* pp.42–48, there is only a negligible difference between those who did and those who did not obtain PACE, App'x.81, which cannot alone justify CFPB's overly burdensome Rule. *See* App'x.387–90; App'x.394–96; *see also* App'x.81 (noting post-2018 reform consumer data shows even smaller difference). This means that CFPB did not "examine[ ] the relevant data," *Bidi Vapor LLC*, 134 F.4th at 1286 (citation omitted), or "reasonably consider[ ] the relevant issues," *FCC*, 592 U.S. at 423, making its reliance on the report arbitrary and capricious.

*Finally*, the PACE Report excluded 22% of PACE applicants because it could not locate their credit histories. As a result, the PACE Report excluded nearly a quarter of the relevant dataset—including consumers containing characteristics contrary to the PACE Report's assumptions such as alternative sources of credit—which inflated the Report's PACE outcome rates to a level CFPB could use to justify the Rule. App'x.114–15; App'x.370–71. The lack of credit histories is unsurprising since PACE does not show up on individual credit reports. 90 Fed. Reg. at 2443, 2479. This further shows that CFPB failed to

reasonably consider "the relevant data," *Bidi Vapor LLC*, 134 F.4th at 1286 (citation omitted), and that CFPB's reliance on the PACE Report violated the APA. CFPB speculated that this exclusion of 22% of control-group applicants was due to reasons other than creditworthiness, 90 Fed. Reg. at 2477–796, but there is no support in the "administrative record," *Salmeron-Salmeron*, 926 F.3d at 1286, or any "articulated" reasoning, *Bidi Vapor LLC*, 134 F.4th at 1286, in the Rule to support that assertion, *see Ala. Env'l Council*, 711 F.3d at 1287 (agency action "must be upheld, if at all, on the basis articulated by the agency itself" in "the record") (citation omitted).

### C. The Final Rule Violates The Tenth Amendment By Infringing Upon State Taxation Authority And By Commandeering State Officials

1. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The Constitution grants Congress only "certain enumerated powers," while all other powers are "reserved for the States" or to the People, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470–75 (2018), enshrining a "system of 'dual sovereignty'" in which the

States "retain[ ] 'a residuary and inviolable sovereignty.'" *Printz v. United States*, 521 U.S. 898, 918–22 (1997) (citation omitted); s*ee Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) ("The States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere."). As particularly relevant here, the Tenth Amendment protects "the taxation authority of state government" as a "central" attribute of "state sovereignty" upon which Congress may not tread, *Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 345 (1994)—a principle recognized both at the Founding and today.

Prior to the ratification of the Constitution, each individual State held the power of direct taxation as "an essential function of government," and the taxing power "was exercised by the Colonies." *Lane Cnty. v. Oregon*, 74 U.S. (7 Wall.) 71, 76 (1868); *see New York v. United States*, 505 U.S. 144, 162–63 (1992). Then, "when the Colonies became State[s] . . . [the taxing power] was exercised by the new governments." *Lane Cnty.*, 74 U.S. at 76. And after the States ratified the Constitution, they did not cede their core, sovereign taxing power to the federal government. *Id.* at 76–77. Rather, "[i]n respect . . . to property, business, and persons, within their respective limits, [the States'] power of taxation

remained and remains entire" just as before the Constitution. *Id.* at 77 (also identifying certain limited restraints on the State's taxing power, such as the power "to tax exports, or imports," in the Constitution).

Under the Constitution, Congress' taxing power with respect "to property, business, and persons" is "*a concurrent power*" with the States, and "nothing in the Constitution [ ] contemplates or authorizes any direct abridgement of [State tax] power by national legislation." *Id.* (emphasis added); *The Federalist* No. 32, at 201 (Alexander Hamilton) (Jacob E. Cooke ed., 1967) ("[T]he power of imposing taxes on all articles other than exports and imports . . . is manifestly a *concurrent and coequal authority* in the United States and in the individual States." (emphasis added)). This taxing power is "as complete in the States as the like power[,] within the limits of the Constitution[,] is complete in Congress." *Union Pac. R.R. Co. v. Peniston*, 85 U.S. (18 Wall.) 5, 30 (1873). The States "retain that authority in *the most absolute and unqualified sense*" and "an attempt on the part of the national Government to abridge [the States] in the exercise of [their taxing authority] would be a violent assumption of power unwarranted by any article or clause of its constitution." *The Federalist* No. 32, *supra*, at 199 (emphasis added).

The early Supreme Court likewise understood "the power of taxation is indispensable to [the States'] existence" and a concurrent power between the States and the federal government. *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 199 (1824); *see McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 430 (1819). Accordingly, the Constitution adopted "a principle which leaves the power of taxing the people and property of a state unimpaired" and "which leaves to the state the command of all its resources." *McCulloch*, 17 U.S. at 430; *accord Lane Cnty.*, 74 U.S. at 76–77. The Constitution does "not interfere with the power of the States to tax for the support of their own governments; nor [was] the exercise of that power by the States, an exercise of any portion of the power that is granted to the United States." *Gibbons*, 22 U.S. at 199. And, importantly, "[t]here is no analogy, then, between the power of taxation and [Congress'] power of regulating commerce." *Id.* at 200.

The Supreme Court's more modern cases have also reaffirmed that "the taxation authority of state government" is "an authority . . . recognized as central to state sovereignty." *Dep't of Revenue of Or.*, 510 U.S. at 345; *Printz*, 521 U.S. at 918–19 (citing *Lane Cnty.*, 74 U.S. at 76). "The power to tax 'is an incident of sovereignty, and is co-extensive with

that to which it is an incident.'" *Curry v. McCanless*, 307 U.S. 357, 366 (1939) (citation omitted). "All subjects over which the sovereign power of a State extends, are objects of taxation[.]" *Int'l Harvester Co. v. Wis. Dep't of Tax'n*, 322 U.S. 435, 444–45 (1944) (citations omitted).

Consequently, "the taxing power of a State . . . may be exercised to an *unlimited extent* upon all property, trades, business, and avocations existing or carried on within the territorial boundaries of the State, except so far as it has been surrendered to the Federal government, either expressly or by necessary implication." *Peniston*, 85 U.S. at 29 (emphasis added); *accord The Federalist* No. 32, *supra*, at 199. With respect to their taxation of "property, business, and persons, within their respective limits," the States have the "discretion" regarding "[t]he extent to which it shall be exercised, the subjects upon which it shall be exercised, and the mode in which it shall be exercised." *Lane Cnty.*, 74 U.S. at 77. "That discretion is restrained only by the will of the people expressed in the State" because "[t]here is nothing in the Constitution which contemplates or authorizes any direct abridgment of this power by national legislation." *Id.* Congress may not "[ ]impair[ ]" the State's "power of taxing the people and property of [the] state," nor may the "judicial

department" ask "what degree of taxation is [a] legitimate use, and what degree may amo[u]nt to [an] abuse of the power." *McCulloch*, 17 U.S. at 430.

The Tenth Amendment also enshrines an "anticommandeering principle" as an essential attribute of State sovereignty, which provides that "Congress [has no] power to issue direct orders to the governments of the States," given that such a power is "conspicuously absent from the list of powers given to Congress" in the Constitution. *Murphy*, 584 U.S. at 471. "While Congress has substantial powers to govern the Nation directly . . . the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York*, 505 U.S. at 162. Ultimately, "[t]he Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz*, 521 U.S. at 925. And "[t]his rule applies . . . not only to state officers with policymaking responsibility but also to those assigned more mundane tasks," whether at the "state [or] local" level. *Murphy*, 584 U.S. at 473.

2. The Final Rule violates the Tenth Amendment both by infringing upon the States' sovereign taxing authority and commandeering State public officials into carrying out federal law.

The Rule infringes upon States' taxing authority. PACE is an exercise of State's taxing authority "[i]n respect . . . to property, business, and persons" which "remains entire[ly]" with the States, *Lane Cnty.*, 74 U.S. at 77, because PACE is a tax assessment that States authorize their local entities to impose on property to achieve the States' sovereign purposes, *see* App'x.124–27; App'x.226–31; *supra* pp.6–7. These entities "collect[ ] [PACE assessments] through the same process as real property taxes." 90 Fed. Reg. at 2435; *see, e.g.*, Fla. Stat. § 163.081(1)(e). Section 307 recognizes that PACE involves taxation, defining PACE as "financing to cover the costs of home improvements that results in a tax assessment on the real property of the consumer." 15 U.S.C. § 1639c (b)(3)(C)(i); *accord* Fla. Stat. §§ 163.081(1)(e), 197.3632(8)(a). Further, States only authorize PACE assessments to achieve sovereign policies such as disaster resistance and clean energy initiatives. *See* App'x.124–25; App'x.78–80; App'x.184–85.

The Rule purports to transform state "tax liens and tax assessments [upon residential property] that are voluntary" into credit which the federal government regulates under TILA. 90 Fed. Reg. at 2447; *see id.* at 2443. States will have to provide federally-mandated disclosures on top of existing State disclosures. *See id.* at 2452–61; Fla. Stat. § 163.081(4). Further, the Rule will penalize PACE programs' local government sponsors, *supra* pp.6–7, for failure to ensure that "the consumer has a reasonable ability to repay the [PACE tax assessment]," 15 U.S.C. § 1639c(a), or provide mandatory TILA, RESPA, and SAFE disclosures to the consumer, even though States have not ceded their tax powers to the Federal government, *see, e.g.,* Fla. Stat. § 163.081(e) ("authoriz[ing]" local governments to "levy non-ad valorem assessments" on a taxpayer after meeting the certain State statutory requirements); 90 Fed. Reg. at 2452–59, 2464–73, 2495, 2450–03.

Consequently, the Rule "direct[ly] abridg[es]" *Lane Cnty.*, 74 U.S. at 77, and "[ ]impair[s]," *McCulloch*, 17 U.S. at 429–30, the States' sovereign taxing power by imposing federal requirements on States' exercise of their taxing power to impose "tax liens and tax assessments," 90 Fed. Reg. at 2434, through their PACE programs. *See* 90 Fed. Reg.

at 2452–59, 2464–73, 2495, *supra* pp.32–33 (listing federal mandates). These requirements lead to a federal mandate that States may not impose State tax assessments on property to further their sovereign goals if State PACE programs fail to meet certain federal standards, thereby "direct[ly] abridg[ing]," *Lane Cnty.*, 74 U.S. at 76–77, States' sovereign taxing power. Congress cannot impair States' taxing power by banning or limiting PACE unless it complies with federal law. *See id.*; *Peniston*, 85 U.S. at 29. The Commerce Clause cannot justify such an impairment, *contra* 90 Fed. Reg. at 2450, because Congress cannot use its enumerated powers—including its power to regulate interstate commerce—to impair States' sovereign taxing power, *see Gibbons*, 22 U.S. at 199; *Printz*, 521 U.S. at 918–22; *Lane Cnty.*, 74 U.S. at 77.[9] Nor can CFPB justify the Rule by claiming that it evenhandedly regulates activity in which both States and private actors engage, *see* 90 Fed. Reg. at 2450, because *only States* exercise the sovereign taxing power that is at the heart of PACE, *supra* pp.49–54.

[9] If CFPB's theory were correct, nothing would prevent Congress from setting state income-tax rates or mandating particular State income-tax exemptions or deductions, on the theory that doing so would promote interstate commerce. *Supra* pp.49–54.

As for the anticommandeering principle, the Rule "compel[s] the States to implement . . . [a] federal regulatory program[ ]" for PACE. *Printz*, 521 U.S. at 925. The Rule imposes TILA requirements on "government sponsor[s] in a PACE transaction," not private PACE administrators. 90 Fed. Reg. at 2449; App'x.124–39. For example, the Rule requires public officials to apply TILA-RESPA integrated disclosures in their State PACE programs, to have mandatory waiting and rescission periods, and TILA ability-to-repay requirements, *supra* 15–16, 32–33, which the Rule itself acknowledges, 90 Fed. Reg. at 2449.

The only way that States can "comply with applicable Federal requirements" in the Rule, *id.* at 2450, is by "enforc[ing] [the] federal regulatory program," *Murphy*, 584 U.S. at 472—namely, TILA, RESPA, and SAFE Act requirements, *supra* pp.15–16. Under the Rule, States cannot implement legal PACE assessments unless they meet the Rule's requirements—a federal commandment to States that the Tenth Amendment squarely forbids, *supra* pp.49—54. This requirement for government sponsors to adhere to CFPB's federal program to run a State-authorized PACE program amounts to an unconstitutional "direct order[ ] to . . . States" regarding administration of their PACE programs,

*Murphy*, 584 U.S. at 471, and "compel[s]" States to run PACE per CFPB's "federal regulatory programs," *Printz*, 521 U.S. at 925.

* * *

In its decision denying a preliminary injunction, the District Court only dealt with the likelihood of success portion of BRIDGE's summary judgment motion in a conclusory fashion. The District Court did not explain why BRIDGE did not show a substantial success on the merits, only stating that it "believe[d] that the issues presented are highly complex and are better resolved at the summary judgment stage of the proceedings, with a more developed factual record and more detailed briefing." App'x.534–44. But that does not make sense in an APA preliminary injunction request, as the Court was presented with substantive legal issues (aside from the undisputed irreparable harm), extensive briefing, and two rounds of preliminary injunction oral arguments. And while the District Court noted in its preliminary-injunction denial order that "it does not appear from the briefing to date that PACE transactions are a *tax*, and that regulations on such financing transactions could establish a violation of the Tenth Amendment,"

App'x.544 at n.2 (emphasis in original), that is incorrect for all of the reasons explained immediately above, *see supra* pp.49–59.

## II. BRIDGE's Members Will Suffer Irreparable Harm Without A Preliminary Injunction

A. Resources spent to comply with an agency rule constitutes irreparable harm. Likewise, suffering monetary losses with no ability to recover constitutes "irreparable harm," *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) (per curiam). This is especially true where recovery is blocked by "sovereign immunity." *Odebrecht Constr. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013). And when challenging an agency rule, "nonrecoverable" compliance "costs" constitute irreparable harm. *Ohio v. EPA*, 603 U.S. 279, 291–92 (2024) (citation omitted). Significant "disruption" and "disorgan[ization]" of businesses by unlawful regulation constitutes an "irreparable injury to [the] business[es]," *Columbia Broad. Sys. v. United States*, 316 U.S. 407, 409, 414, 419, 423 (1942), as does the threatened "loss of market position," *Abbott Lab'y v. Sandoz, Inc.*, 544 F.3d 1341, 1361–62 (Fed. Cir. 2008), or "the loss of customers and goodwill," *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 780 (11th Cir. 2015) (citations omitted).

B. With its preliminary injunction motion, BRIDGE presented undisputed evidence establishing substantial irreparable injuries unless the Rule is enjoined, *see* App'x.384–96, which the District Court did not discuss in denying the preliminary injunction motion, App'x.541–44. BRIDGE's members are likely to suffer significant financial harm from the Rule that cannot be remedied via money damages from CFPB. Most problematically, on March 1, 2026, when the Rule is set to take effect, BRIDGE's members will lose most of their business volume, and no relief the courts can give them can remedy that harm.

BRIDGE's members will suffer irreparable harm absent a preliminary injunction. Even before the Rule's March 1, 2026, effective date, Renew will incur approximately $2,528,000 in compliance costs across legal, engineering, product, project management, and operations, App'x.389, including about $32,000 in legal fees in January 2025 alone and an additional $448,000 in legal fees over the 14 months from January 2025 to March 1, 2026, due to the Rule's complexity. *Id.* Renew also expects to incur about $980,000 in additional headcount costs to devote internal technology and product resources and hire four full-time subject-matter experts, App'x.388–89, and $1,100,000 to retain third-party

consultants in engineering and product management to ensure timely implementation. App'x.389.

Ygrene has already reallocated internal resources and retained outside legal and compliance counsel to assess the Rule and plan for implementation, spending nearly $100,000 and anticipating another $500,000 in related costs over the next year. App'x.394. Implementing the Rule will also require a new technology platform, associated internal management resources, and more than 1,000 employee hours already devoted to evaluating systems and vendors; Ygrene projects technology and project management implementation costs exceeding $1,000,000, with ongoing outside technology expenditures expected to surpass $1,000,000 annually. App'x.394–95. Ygrene will need at least eight additional full-time employees at an added cost of $880,000. App'x.395. It expects to continue incurring significant ongoing compliance costs. App'x.395–96.

Most importantly now given the approach of the March 1 effective date, both Renew and Ygrene will suffer catastrophic business harms if the Rule takes effect on March 1, 2026. Even CFPB expects that PACE companies like BRIDGE's members will suffer "reduced lending volumes"

from the Rule. 90 Fed. Reg. at 2490; *see also id.* at 2487. BRIDGE's members have provided undisputed declarations that their volume will dramatically decrease after the Rule takes effect. Renew calculated that it expects to lose nearly 72% of its funding volume, which would devastate its ability to do business and cause it to continue incurring significant costs. App'x.390. Ygrene likewise expects to lose approximately 78% of its funding volume once the Rule takes effect. App'x.395–96.

In this APA suit, BRIDGE cannot obtain money damages from CFPB because APA Section 702 waives the Government's immunity only for actions seeking relief other than money damages. *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260–61 (1999); *see* 5 U.S.C. § 702. As a result, BRIDGE has "no guarantee of eventual recovery" of losses resulting from compliance with the Rule. *Ala. Ass'n of Realtors*, 594 U.S. at 765.

That the District Court set an expedited summary-judgment schedule does not at all undermine BRIDGE's urgent need for a preliminary injunction. Under the Rule, BRIDGE's members must come into compliance by March 1, 2026, requiring them to spend substantial, unrecoverable funds well in advance of that date. And after the Rule goes

into effect on March 1, 2026, BRIDGE's members will fatally lose more than 70% of their business volume. The parties completed a summary judgment hearing on December 16, 2025, R.71, but the District Court did not issue a decision at that time. Rather, it asked the parties to provide proposed findings of fact and conclusions of law on January 5, 2026, R.71, after which the District Court will at some unknown point issue a decision—while BRIDGE's members' harms continue to accrue.

## III. The Balance Of The Equities And The Public Interest Strongly Favor Granting A Preliminary Injunction, Including Because Enforcement Of The Rule Is Unlawful

The third and fourth preliminary injunction factors "merge" where "the Government is the opposing party." *Nken*, 556 U.S. at 435. Relevant here, neither the CFPB nor the public has an interest in enforcing unlawful regulations. *See Scott*, 612 F.3d at 1297. Further, the Court may give "regard for the public consequences," including nonparties, when granting relief. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Additionally, in the context of Tenth Amendment violations, it "serves the public interest" to "help[ ] preserve state sovereignty" and "the States' sovereign rights" that are essential to "the 'two-government system established by the Framers.'" *West Virginia v. ex rel. Morrisey v.*

*U.S. Dep't of the Treasury*, 59 F.4th 1124, 1149 (11th Cir. 2023) (citations omitted); *see* App'x.124–31.

Here, these factors strongly favor enjoining the Rule. Neither CFPB nor the public has any legitimate interest in the illegal Rule's enforcement. *See Scott*, 612 F.3d at 1297. The important public benefits PACE offers further weigh in favor of the Rule's enjoinment. *Weinberger*, 456 U.S. at 312. PACE gives homeowners who might otherwise not receive credit—especially vulnerable, low-income homeowners in natural-disaster-prone States—a reliable method to fund critical home-improvement projects, such as fire, hurricane, and flood hardening, without incurring personal debt. *Supra* pp.6–7. The Rule threatens homeowners' ability to protect their properties. *Supra* pp.6–7, 19–21. That is why, for example, the Obama Administration championed multiple PACE initiatives to "lead[ ] to reduced energy bills, more empowered consumers, and cleaner communities." App'x.153–59. The Rule threatens to increase the cost of, or make entirely unavailable, PACE transactions, thus depriving the public of the benefits that PACE brings. *Supra* pp.6–7, 60–63. And because the Rule infringes upon the States' sovereign power of taxation, *supra* pp.49–59, an injunction would

"serve[ ] the public interest" by "help[ing] preserve state sovereignty," *West Virginia*, 59 F.4th at 1149 (citations omitted).

## CONCLUSION

This Court should reverse the District Court's decision and remand for entry of an order preliminarily enjoining the Rule.

Dated: December 23, 2025

Respectfully submitted,

s/*Misha Tseytlin*
MISHA TSEYTLIN
*Counsel of Record*
KEVIN M. LEROY
CARSON A. COX
TROUTMAN PEPPER LOCKE LLP
111 South Wacker Dr., Suite 4100
Chicago, IL 60606
(608) 999-1240
misha.tseytlin@troutman.com
kevin.leroy@troutman.com
carson.cox@troutman.com

JOHN S. GIBBS III
ALEXANDER J. HILL
TROUTMAN PEPPER LOCKE LLP
600 Peachtree Street NE,
Suite 3000
Atlanta, GA 30308
(404) 885-3000
evan.gibbs@troutman.com
alexander.hill@troutman.com

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,858 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14- point Century Schoolbook type.

Dated: December 23, 2025

*s/Misha Tseytlin*
MISHA TSEYTLIN

*Counsel for Plaintiff-Appellant Building Resilient Infrastructure & Developing Greater Equity, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on December 23, 2025. I served all counsel of record by CM/ECF.

Dated: December 23, 2025

*s/Misha Tseytlin*
Misha Tseytlin

*Counsel for Plaintiff-Appellant Building Resilient Infrastructure & Developing Greater Equity, Inc.*

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

15 U.S.C. § 1639c(b)(3)(C) .......... 1a

## 15 U.S.C. § 1639c(b)(3)(C)

(C) Consideration of underwriting requirements for Property Assessed Clean Energy financing.

(i) Definition. In this subparagraph, the term "Property Assessed Clean Energy financing" means financing to cover the costs of home improvements that results in a tax assessment on the real property of the consumer.

(ii) Regulations. The Bureau shall prescribe regulations that carry out the purposes of subsection (a) and apply section 130 with respect to violations under subsection (a) of this section with respect to Property Assessed Clean Energy financing, which shall account for the unique nature of Property Assessed Clean Energy financing.

(iii) Collection of information and consultation. In prescribing the regulations under this subparagraph, the Bureau—

(I) may collect such information and data that the Bureau determines is necessary; and

(II) shall consult with State and local governments and bond-issuing authorities.